UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

DAVIS ELECTRONICS CO, INC., et. al                    PLAINTIFFS

v.                                        CIVIL ACTION NO. 3:20-CV-00038-CRS-CHL

SPRINGER CAPITAL, LLC, et. al                         DEFENDANTS

## MEMORANDUM OPINION

This matter is before the Court on Defendants Springer Capital, LLC and SC Echo Associates, LLC's ("SC Defendants") motion to exclude expert testimony under Federal Rule of Evidence 702. DN 52. Plaintiffs Davis Electronics, LLC, et. al ("Plaintiffs") filed a response, and Defendants replied. DN 61; DN 62. This matter is now ripe for adjudication. For the reasons stated below, Defendants' motion will be denied.

I.   *Background*

In 1985, Gar Davis ("Davis") acquired the property ("the Davis property") located at 2211 Brownsboro Road in Louisville, Kentucky and constructed a building on the property ("the Davis building") shortly thereafter. Davis Depo., DN 60-1 at PageID# 818. Since that time, Davis has owned and occupied the property, operating an electronics business ("Davis Electronics, LLC") out of the Davis building. *Id.*

An apartment complex ("The Views") has existed on Biljana Drive uphill from the Davis property since before the Davis building was constructed. *Id.* at PageID# 819. The apartment complex consists of three buildings. Weigel Report DN 61-4 at PageID# 901. "Building 1" of the The Views sits at the top of a grassy hill immediately adjacent to the western side of the Davis

building. DeAngelis Report DN 52-1 at PageID# 644, 692; Weigel Report DN 61-4 at PageID# 901-902.

Thomas Greenwood ("Greenwood') is a principal at Springer Capital, LLC and a manager of SC Echo Associates, LLC. Amended Complaint, DN 47 at PageID# 529. Greenwood acted as the point of contact between Davis and the SC Defendants. *See* Davis Deposition, DN 60-1 at PageID# 806. For the purposes of this opinion, Greenwood will be treated as an agent of SC Defendants.

Davis, on behalf of Davis Electronics, filed a complaint against SC Defendants in Jefferson Circuit Court in November of 2019, claiming that excess water from The Views was draining onto the Davis property causing damage to the land and to the Davis building. State Court Complaint, DN 1-3. SC Defendants timely removed the case to federal court pursuant to 28 USC § 1332. Notice of Removal, DN 1. Davis later filed an amended complaint, adding Greenwood and Brookside Properties as Defendants and adding Gar and Teresa Davis as Plaintiffs. First Amended Complaint, DN 47 at PID 527.

The facts of this case are heavily contested and both parties have identified expert witnesses to testify to the nature and cause of the water damage to the Davis property. Plaintiffs have disclosed as expert witnesses Joseph Cattan, P.E. of Cattan Inspection and Engineering, Inc. and Terence Weigel, Ph.D. of Donan Engineering Co., Inc. *See* Motion to Exclude, DN 52 at PageID# 562.

*A. Davis Complaint*

Davis maintains that water drainage from The Views was not an issue prior to renovations conducted at The Views between 2016 and 2019. State Court Complaint, DN 1-3 at PageID# 24-25. Davis claims that as a result of these renovations, water drainage that was

2

previously directed away from the Davis property is now directed toward it. *Id.* at PageID# 25. Specifically, Davis claims, the roof drainage coming off Building 1 now enters the Davis property via the grassy hill on the western side of the Davis building and that this water has caused exterior and interior damage to that side of the building. *See* Davis Depo., DN 60-1 at PageID# 809; Weigel Report DN 61-4 at PageID# 903, 905 (Figure 3). Davis further alleges that the runoff water has caused a curb at the northern end of his property to deteriorate and that water now flows over the curb and pools on the east side of the Davis property. State Court Complaint, DN 1-3 at PageID# 25; Weigel Report DN 61-4 at PageID# 903.

Davis first noticed water entering the westside of the Davis building on August 17, 2017 and met with the manager and a maintenance worker at The Views the next day to discuss the water flow. Davis Deposition, DN 60-1 at PageID# 806. He then alerted Greenwood to the problem and sent Greenwood photos of the water and the damage. *Id.* at PageID# 806-07. At that time, Davis claims that Greenwood promised to make necessary repairs to The Views to prevent future flooding events. *Id.* at PageID# 807. At some time between August of 2017 and August of 2019, a black corrugated pipe was added to a downspout on Building 1, causing water to flow from that downspout directly downhill toward the Davis property. *Id.* at PageID# 822-23. In May of 2019 Davis decided to take measures to mitigate the damage that continued to occur to his property. *Id.* at PageID# 811-12. This included changing the landscaping and adding concrete to certain areas that tended to flood, installing a drain system, installing a curb to deflect water, and repaving the parking lot to create a "swale," allowing water to flow away from the Davis building. *Id.*

Because water continued to pool behind the Davis building, in August of 2019 Davis hired an engineer, Joseph Cattan, to identify how to address the water flow issues. *Id.* at PageID#

3

811, 814. Davis claims that he notified Greenwood of the continued problem and the two of them met on October 2, 2019 to visually inspect the properties together. *Id.* at PageID# 814. Davis claims that, as a result of this inspection, Greenwood recognized the problem and agreed to correct it. *Id.* at PageID# 814-15. In October and November of 2019 SC Defendants had repairs made to the deteriorated curb at the northern end of the Davis property and had the corrugated pipe attached to the downspout on Building 1 rerouted through a retaining wall on the Davis property. *See* Weigel Report, DN 61-4 at PageID# 915.

Although these corrective measures helped to improve the water flow issue, Davis claims that, based on the analyses provided by Cattan and Weigel, further repair and rerouting work is still needed to completely alleviate the problem. *See id.* at PageID# 921-23 (describing the recommended corrective measures needed to alleviate the water drainage issues); Cattan Report, DN-61-6 at PageID# 963. Davis claims that SC Defendants are responsible for making such further repairs/rerouting and are liable for the extensive damage to the Davis property. Amended Complaint, DN 47 at PageID# 534-36. Further, Davis seeks to permanently enjoin SC Defendants from intentionally draining water from The Views property toward the Davis property. *Id.* at PageID# 533.

*B. Cattan and Weigel's Expert Reports*

Cattan and Weigel both conducted on-site inspections of the Davis property at different times. *See* Cattan Report, DN 61-6 at PageID# 961; Weigel Report, DN 61-4 at PageID# 901. Neither Cattan nor Weigel quantitatively assessed water flow, conducted dye tracing studies, or investigated the soil on the Davis property. *See* Defendants' Support Memo, DN 52-1 at PageID# 566; Cattan Declaration, DN 61-5; Weigel Declaration, DN 61-3.

Cattan visited on one occasion in August of 2019, after the mitigation work was done on the Davis property. Cattan Report, DN 61-6. Cattan did not observe flowing water on this day, as it was not raining, but does report observations consistent with water flow, such as "an extensive drainage path." *Id.* at PageID# 961. In Cattan's opinion, to eliminate the water drainage issues on the Davis property, water drainage from The Views, including the roof drainage from Building 1, would need to be controlled and diverted. *Id.* at PageID# 963.

Weigel inspected the property three times. Weigel Report, DN 61-4 PageID# 901. The first inspection occurred about ten days after Cattan's visit in August of 2019. *Id.* Weigel did not observe flowing water on this visit, but extensively documented his observations of the Davis building, the Davis property, and The Views. *Id.* at PageID# 916-19. During his next two visits, in October of 2019 and January of 2021, Weigel observed the properties during and after a "rain event." *Id.* at PageID# 901. In his report, Weigel did not observe any pooling on the Davis property, but he did note the path of water flow. *Id.* at PageID# 919-20. Weigel also reviewed a number of photographs and video clips provided by Plaintiffs, reports from other engineering experts who had inspected the properties (including Cattan's report), Plaintiffs' complaint, and other discovery documents. *Id.* at PageID# 904.

In his conclusions, Weigel stated that the corrugated drainpipe that exits through the retaining wall was blocked, causing water to penetrate the retaining wall. *Id.* at PageID# 923. He further asserted that the curb on the northern end of the Davis property was not sufficiently tall to prevent water from pouring over onto the Davis property during heavy rainfall. *Id.* at PageID# 922. Finally, Weigel concluded that the water damage to the Davis building and land was the result of past and present excess water drainage coming from The Views. *Id.* at PageID# 924.

II.    Daubert *Motion*

SC Defendants have filed a motion to exclude Cattan and Weigel from testifying at the trial of this action. Motion to Exclude, DN-52. The motion is based on SC Defendants' claim that the opinions of Cattan and Weigel do not comport with the reliability requirements of Federal Rule of Evidence ("FRE") 702. Defendants' Support Memo, DN 52-1 at PageID# 563. In essence, SC Defendants maintain that Cattan and Weigel failed to exercise scientific rigor in executing their investigations of The Views and Davis property and, thus, their opinions lack a credible basis. *Id.* at PageID# 563-68.

III.    *Legal Standard*

FRE 702 allows opinion testimony by "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education," if

(a) the expert's scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based upon sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. The Supreme Court has interpreted this rule to mean that trial court judges are to act as "gatekeepers" and determine whether expert testimony is sufficiently relevant and reliable to be admissible. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593 (1993). For an expert assessment to be admissible under FRE 702, a party must demonstrate not that the assessment is *correct*, but that it is *reliable*, and must do so by a preponderance of the evidence. *See In re Paoli Yard PCB Litigation*, 35 F.3d 717, 744 (3d Cir. 1994) (emphasis added).[1] "So

---

[1] The court went on to say, "The grounds for the expert's opinion merely have to be good, they do not have to be perfect. The judge might think that there are good grounds for an expert's conclusion even if the judge thinks that

6

long as the proffered testimony is properly grounded, well-reasoned, and not speculative, district courts should admit it, for the rejection of expert testimony is the exception rather than the rule." *Crouch v. John Jewell Aircraft, Inc.*, 2016 WL 157464 at *2 (W.D. Ky. 2016) (internal citations and punctuation omitted). Even "shaky" expert testimony should be admitted, and "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof" should be employed to attack the testimony. *Daubert* at 596.

In assessing the reliability of expert scientific testimony, the Court in *Daubert* stated that a judge may consider such general factors as the "known or potential rate of error" of any methods employed by the expert, as well as whether these methods "can be (and ha[ve] been) tested," "ha[ve] been subjected to peer review and publication," and have gained "general acceptance" within "a relevant scientific community." *Id.* at 593-94. The Sixth Circuit has cautioned that trial courts should look for certain "red flags" when assessing the FRE 702 admissibility of expert testimony under *Daubert*. *Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 527 (6th Cir. 2012). Indications that expert testimony might lack sufficient reliability include "reliance on anecdotal evidence, improper extrapolation, failure to consider other possible causes, lack of testing, and subjectivity." *Id.* (citing *Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 177 (6th Cir. 2009)). Further, district court decisions to exclude expert testimony are routinely upheld by the Sixth Circuit when the testimony lacks a credible basis. *See Nelson v. Costco Wholesale Corp.*, 2021 WL 2459472 at *8 (W.D. Ky. 2021) (citing multiple Sixth Circuit cases affirming lower court decisions to exclude expert testimony).

However, the Supreme Court has emphasized that the factors it put forth in *Daubert* do not constitute a "definitive checklist or test" for federal district courts to employ when evaluating

---

there are better grounds for some alternative conclusion, and even if the judge thinks that a scientist's methodology has some flaws such that if they had been corrected, the scientist would have reached a different result." *In re Paoli R.R. Yard Pcb Litig.*, 35 F.3d 717, 744 (3d Cir. 1994).

expert testimony under FRE 702. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1998) (citing *Daubert*, 509 U.S. at 593). Rather, the Court in *Kumho* agreed with the district court's pronouncement that "the test of reliability is flexible, and *Daubert*'s list of specific factors neither necessarily nor exhaustively applies to all experts or in every case." *Kumho* at 158.

The Sixth Circuit has reiterated this sentiment on multiple occasions. *See, e.g. Dilts v. United Grp. Servs., LLC,* 500 F.App'x 440, 445 (6th Cir. 2012) ("[A] trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable.") (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1998)); *Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 429-30 (6th Cir. 2007) (acknowledging the "flexible" nature of the trial court's inquiry into expert witness reliability) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1998)). Ultimately, the trial court is tasked with applying *Daubert* in a manner that admits relevant expert testimony, while excluding "misleading junk science." *Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 177 (6th Cir. 2009)). This means that the trial court should ensure that testifying expert witnesses "employ in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Newell Rubbermaid, Inc.*, 676 F.3d at 527 (citing *Kumho Tire Co.*, 526 U.S. at 150) (internal punctuation omitted).

IV.   *Analysis*

SC Defendants contend that the opinions of Cattan and Weigel are unreliable because their methods of assessment did not include a testing of the soil on the property, a quantitative analysis of water flow, or a dye tracing study to determine the source of the water damage to the Davis property. Defendants' Reply Memo, DN 62 at PageID# 966. On this basis, SC Defendants claim that Cattan's and Weigel's opinions raise several of the "red flags" noted by the Sixth

Circuit. *See* Defendants' Support Memo, DN 52-1 at PageID# 563. Specifically, SC Defendants assert that the opinions should be excluded due to a lack of testing, improperly extrapolated conclusions, a failure to rule out other causes, and a lack of objectivity. *Id.* at 564.

The Court acknowledges that such focal points may be helpful when evaluating the reliability of Cattan's and Weigel's expert opinions through the lens of *Daubert*. However, even in light of these considerations, the Court is not convinced that the opinions provided by Cattan and Weigel are of the type intended to be excluded under FRE 702. There is simply no indication that Plaintiffs is attempting to introduce "junk science" masquerading as expert analysis.

*A. Cattan's and Weigel's Conclusions are Testable*

The framework in *Daubert* indicates that a court can choose to examine whether the methodology used to develop an expert opinion can be, or has been, tested or refuted. 509 U.S. at 593. The Advisory Committee Notes to amended FRE 702 explains that this factor turns on "whether the expert's theory can be challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability." USCS Fed Rules Evid R. 702. The critical factor in comporting with the reliability standard set forth in FRE 702 is that the expert "makes clear the evidence he is relying on to form his conclusions" and "[i]t is clearly possible to test those conclusions objectively." *Lesser v. Camp Wildwood*, 282 F. Supp. 2d 139, 144 (S.D.N.Y. 2003).

Courts, including those in the Sixth Circuit, have held that expert testimony can be reliable without the expert performing tests to support his or her theory. *See, e.g. Clay v. Ford Motor Co.*, 215 F.3d at 668 (6th Cir. 2000) (stating that "the district court in its discretion, could have decided that [the expert's] failure to test his theories went to the weight of his testimony…, not to its admissibility"); *Jahn v. Equine Servs., PSC*, 233 F.3d 382, 393 n. 8 (6th Cir. 2000)

(stating that "a lack of supporting studies is not, in itself, fatal to the admissibility of expert testimony"); *Potts v. Martin & Bayley, Inc.*, 2011 WL 4703058 at *6 (W.D. Ky. 2011) ("Depending on the facts of a given case, it is well within a district court's discretion to find an expert's opinion reliable although he has conducted no testing.").[2,3]

In the present case, both parties seem to agree that the methods employed by Cattan and Weigel do not qualify as "tests" in the same sense as a dye tracing study or a soil analysis. *See* Defendants' Support Memo, DN 52-1 at PageID# 566; Plaintiffs' Response Memo, DN 61 at PageID# 884. However, while SC Defendants claim this raises a red flag to admissibility, Plaintiffs maintains that testing of this kind is not required for reliability under FRE 702. *Id.* It is the opinion of the Court, that regardless of whether the methods employed by Cattan and Weigel qualify as "tests," the opinions rendered by Cattan and Weigel are reliable because, at minimum, the opinions are based on testable theories.[4]

SC Defendants attempt to draw an analogy between the case at bar and that of *Reynolds v. Freightliner, LLC*, 2006 WL 5249744 (E.D. Ky 2006). Defendants' Reply Memo, DN 62 at

---

[2] *See also Jacobs v. Tricam Indus., Inc.*, 816 F. Supp. 2d 487, 493 (E.D. Mich. 2011) ((finding that "testing is not required in every case, particularly where, as here, the expert conducted an examination of the physical evidence") (citing Kamp v. FMC Corp., 241 F. Supp. 2d 760, 763-764 (E.D. Mich. 2002)); *Lidle v. Cirrus Design Corp.,* 2010 U.S. Dist. LEXIS 67031 at *16-18 (S.D.N.Y. 2010) (finding that the expert's "failure to test his theory is not fatal"); *Williams v. Gen. Motors Corp.*, 2007 U.S. Dist. LEXIS 80596 at *6 (N.D. Ohio Oct. 30, 2007) ("Rosenbluth has relied on various sources, including academic and government studies. His failure to perform his own independent tests or studies of his theories goes to the weight of his testimony, not to its admissibility."); *Travelers Prop. & Cas. Corp. v. GE*, 150 F. Supp. 2d 360, 366 (D. Conn. 2001) ("[A]lthough [the expert] did not test his theory experimentally, his theory is capable of being tested, so that [opposing party] experts could employ testing to undercut it and, indeed, have engaged in such efforts.").

[3] Defendants claim that *Clark v. Chrysler Corporation*, 310 F.3d 461 (6th Cir. 2002) cuts against the idea that expert testimony can be reliable without the expert performing any tests. *See* Defendants' Reply Memo, DN 62 at PageID# 966. It is true that the court in *Clark* took into consideration the fact that the expert in this case had *previously* performed the same types of tests. *See* 310 F.3d at 468. However, this was just one of many factors considered by the court. *Id.* at 467-70. The court also assessed the reliability of the expert's testimony in view of the expert's education, employment experience, technical knowledge, and familiarity with the specific subject matter, as well as the strength of the expert's testimony at trial and the expert's firsthand observations. *Id.* The court did not indicate that any one of these factors was determinative.

[4] As noted in *Crouch v. John Jewell Aircraft, Inc.*, the fact that a theory "'can be (and has been) tested' bolsters its reliability under *Daubert*." 2016 WL 157464 at *4 (W.D. Ky. 2016) (citing *Daubert*, 509 U.S. at 593).

PageID# 968. This analogy is not on-point. In *Reynolds*, the district court excluded the testimony of Stephen Chewning, an accident reconstructionist who was tasked with determining which way the cab of a tractor trailer driven by Plaintiff's decedent rolled, "the direction of the forces imparted to" the decedent during that roll, and whether the decedent "could . . . have potentially regained steering control if the seatbelt had not broken and the door came open." *Reynolds* at *2. Chewning tendered a one-and-a-half-page report that included conclusions, such as an estimation of the speed of the tractor trailer at the time of the accident and the trajectory and force of the decedent's body as the vehicle rolled over, without any explanation of the methodology he employed to reach these conclusions. *Id.*

The defendant's objection to Chewning's testimony was not grounded solely on Chewning's lack of testing, but also on the fact that, by failing to identify his methodology, the defendants could not determine the reliability of Chewning's method or refute his conclusions by conducting their own tests. *Id.* at *10. The court agreed, stating that the defects in Chewning's assessment could not be cured by cross-examination or deposition because his analysis "lacks a methodology which can be questioned or challenged." *Id.*

In the case at bar, the reports generated by Cattan and Weigel were the products of thorough investigation, measurement, and observation. The conclusions reached by each expert are supported by readily observable evidence collected during the on-site inspections. Unlike the conclusions drawn by Chewning in *Reynolds*, which should have been supported by mathematical calculations and the application of fundamental physics, the conclusions detailed in the reports submitted by Cattan and Weigel are supported by open and apparent observations. For example, Weigel corroborated his conclusion that water continues to flow over the curb on the northern end of the property by noting and photographing a lack of vegetation on the hill near

the curb. Weigel Report, DN 61-4 PageID# 922, 956 (photograph 62). Similarly, Cattan describes a visible "drainage path" from Building 1 to the Davis property. Cattan Report, DN61-6 at PageID# 961. Such conclusions need not be substantiated with extensive scientific analysis to be sufficiently reliable for the purposes of FRE 702.

Further, the methodology employed and the hypotheses proffered by Cattan and Weigel are testable and refutable, which distinguishes this case from *Reynolds*. Because Cattan and Weigel adequately describe the specific evidence and observations that they believe support their conclusions, their theories can be effectively disputed in court. In fact, SC Defendants have offered an expert opinion report that they believe relies on superior methods of inquiry and undercuts the conclusions of Plaintiffs' experts. Thus, the appropriate venue for resolving this disagreement is the courtroom.

*B. Cattan and Weigel Employed Generally Acceptable Methods*

Both Cattan and Weigel have indicated that they used deductive reasoning to reach their conclusions. Cattan Declaration, DN 61-5; Weigel Declaration, DN 61-3. Courts recognize deductive reasoning based on observation as a valid method of forming the basis for an expert opinion. *See, e.g. United States v. Frazier*, 387 F.3d 1244, 1298 (11th Cir. 2004) (stating "[c]ase law is replete with judicially-sanctioned instances . . . of deductive reasoning"). This is particularly true when the expert has examined the physical evidence. *See Mackenzie v. JLG Indus.*, 2014 U.S. Dist. LEXIS 177545, *20 (W.D. Ky 2014) ("An expert is not precluded from making deductive conclusions based on physical observations."). *See also Jacobs v. Tricam Indus., Inc.*, 816 F. Supp. 2d 487, 493 (E.D. Mich. 2011) ("[T]esting is not required in every case, particularly where, as here, the expert conducted an examination of the physical evidence.") (citing Kamp v. FMC Corp., 241 F. Supp. 2d 760, 763-764 (E.D. Mich. 2002))

In *Ferris v. Tennessee Log Homes, Inc.*, the Western District of Kentucky held that an engineer's experience in a specific industry was a sufficient basis for the engineer to draw reliable conclusions based on a site visit, visual observations, photographs, measurements, and relevant building plans. 2009 U.S. Dist. LEXIS 44656 at *36 (W.D. Ky. 2009). The court stated, "Drawing upon one's educational background and practical experience is a reliable methodology through which to develop opinions and reach conclusions about scientific, technical, or other areas of specialized knowledge." *Id.* (quoting *Zerega Ave. Realty Corp. v. Hanover Ins. Co.*, 2006 U.S. Dist. LEXIS 30034 at *11 (S.D.N.Y. 2006) (internal punctuation omitted)). Even in *Reynolds*, the court indicated that had Reynolds demonstrated that Chewning was appropriately qualified, Chewning's testimony may have been sufficiently reliable to overcome the conclusory nature of the opinions in his report. *Reynolds*, 2006 WL 5249744 at *10.

Plaintiffs asserts that the deductive analysis performed by Cattan and Weigel is a widely used and acceptable method under the circumstances of the present case. Plaintiffs' Response Memo, DN 61 at PageID# 886. Cattan and Weigel are both experienced engineers with extensive backgrounds in construction and structural evaluation. *See* Cattan CV, DN 61-1; Weigel CV, DN 61-2. Terence Weigel holds a doctorate in structural engineering and was an engineering professor for over thirty years. Weigel CV, DN 61-2. Both Cattan and Weigel have declared under that the methods they employed to assess the Davis property are routinely utilized and accepted methods in their field. *See* Cattan Declaration, DN 61-5; Weigel Declaration, DN 61-3. SC Defendants have offered no argument that directly refutes Plaintiffs' contention that deductive analysis is an acceptable method in Cattan's and Weigel's field. Thus, the Court finds Cattan's and Weigel's use of deductive reasoning to be a generally acceptable method for the purposes of FRE 702.

*C. Remaining Objections*

SC Defendants' argue that Cattan and Weigel drew speculatory conclusions and failed to rule out other possible causes for the damage to the Davis property.[5] Defendants' Support Memo, DN 52-1 at 564. Both of these objections rely on the contention that Cattan's and Weigel's opinions lacked the support of an underlying methodology. Because the Court finds that the deductive analysis performed by Cattan and Weigel is an acceptable method for the purposes of FRE 702 reliability, there exists a methodological foundation for the conclusions in Cattan's and Weigel's reports. Further, as with any deductive analysis, Cattan and Weigel used reason and experience to draw logical conclusions about the most likely causes of the conditions they observed, ruling out unlikely possibilities. They have attested to as much in their respective declarations. Cattan Declaration, DN 61-5 at PageID# 958-59; Weigel Declaration, DN 61-3 at PageID# 895-96.

The Court finds that Plaintiffs have shown by a preponderance of the evidence that the expert opinions of Cattan and Weigel are sufficiently reliable for the purposes of FRE 702. The conclusions outlined in Cattan and Weigel's reports are supported by clearly articulated observations. Further, it is possible to test the theories proffered by Cattan and Weigel and the deductive analysis they employed has been accepted by the courts cited in this opinion. Thus, SC Defendants' motion to exclude Cattan's and Weigel's testimony will be denied.

September 3, 2021

**Charles R. Simpson III, Senior Judge**
**United States District Court**

---

[5] SC Defendants also raised the argument that Cattan's and Weigel's opinions lacked objectivity. Defendants' Memorandum in Support of Motion to Exclude, DN 52-1 at 564. However, the Court found this argument unpersuasive, unsubstantiated, and redundant with the other arguments in the memorandum.

14